T Barry Mills

Δ Revised Hemmingway

STATE OF MAINE  
HANCOCK, SS.

SUPERIOR COURT  
CIVIL ACTION  
Docket No. CV-06-19  
JLH -HAN - 9/30/2007

Roberta L. Greany,  
    Plaintiff

v.

Decision and Judgment

DONALD L. GARBRECHT  
LAW LIBRARY

JAN 3 0 2008

Denise D. Dixon,  
    Defendant

Hearing on the complaint and counterclaim was held on April 23 and 24, 2007. Both parties were present and represented by counsel. Subsequent to the trial, the parties filed written argument, which the court has considered.

The parties' claims arise out of a transaction in which Roberta L. Greany sold to Denise D. Dixon all shares in DW Communications Group (DWC), which was a corporation that provided graphic design, public relations and related services. In this action, Greany alleges that Dixon has failed to make post-transaction payments to her as required by the parties' written contract, and in her counterclaim Dixon contends that the contract is unenforceable.

Greany founded DWC in 1985. It began its business operations in Blue Hill but moved its headquarters to Portland in 1998. Except for a period of time in the mid to late 1990's when some of the corporate shares were owned by a third-party, Greany was the company's sole shareholder until she sold those shares to Dixon in September 2004. Greany had decided earlier in 2004 that she wanted to pursue other interests and talked to several people about a possible sale of the company. Coincidentally, Dixon contacted Greany to inquire about possible work as a free-lance contributor to DWC. Dixon herself had more than twenty year's experience in broadcasting and agency management. She had been a partner at three such firms, most recently serving as the chief operating officer at an advertising agency in New Hampshire. She had separated from that firm and wanted to relocate to Portland. When she met with Greany to discuss free-lance work,

1

Greany informed her that DWC did not have a need for such services but asked Dixon if she (Dixon) had any interest in purchasing the company itself. In fact, Dixon had such an interest: acquisition of DWC would place her back into the advertising and public relation industry with existing clients and without the need to create a new business, and the arrangement also would steer clear of a non-competition agreement associated with her departure from the New Hampshire firm.

These initial contacts generated further communications between the parties. Additionally, Dixon consulted with her stepfather, who is an attorney and who gave her legal advice, and with Roger Hamel, who is a CPA with a practice in New Hampshire. Dixon had worked with Hamel previously, because Hamel provided accounting services for the New Hampshire firm where Dixon served as the COO. Hamel caused Dixon to request financial information about DWC. Greany provided all of that information Dixon that Hamel sought, and the record demonstrates affirmatively that the information was accurate. Hamel disclosed to Dixon that he had concerns about the wisdom of the prospective transaction, largely because of the nature of the business generally, including the instability of any agency's client base. Hamel also gave Dixon guidance as she and Greany negotiated the terms of the purchase and sale. His advice particularly addressed the structure of payments that Dixon ultimately agreed to make to Greany. Those payments were tied to the future performance of the firm. In the end, as Hamel put in during his testimony, he is confident that Dixon was an informed buyer.

As Dixon acknowledged during her testimony, she knew that the purchase of a service business such as DWC is "tricky." In fact, her stepfather (the attorney) and Hamel (the accountant) both recommended that she should not purchase DWC. As she put it, however, she "ignored their advice" and eventually went on to acquire the company. Going in to the transaction, Dixon knew that she was risking her life savings in the deal.

The direct communications between Greany and Dixon resulted in the disclosure of a considerable amount of information about the business, its past performance and its present status. The record contains numerous emails between the parties. *See* plaintiff's exhibit 2. Additionally, Dixon worked at DWC for several weeks prior to the actual transaction. During that time, she used the business' bookkeeping software, "Clients and

Profits." Dixon was quite familiar with this system, which was used at the New Hampshire firm she had recently left, although it appears that in New Hampshire, she may not have used as many aspects of the program as were used at DWC. Also while Dixon was on site prior to the sale, the firm's long-standing bookkeeper, Jill Shannon, gave notice that she was leaving for a more attractive employment situation. Dixon knew about this prior to the sale.

In early August 2004, the parties executed a letter of agreement for the transfer of ownership in the business. *See* defendant's exhibit 153. This led to a process, concluding at the end of September 2004, in which Greany and Dixon, both in consultation with other professional advisors, negotiated a draft instrument setting out the terms of the sale of the business. They both executed the document on September 30, 2004, effecting a transfer of the ownership of all corporate stock from Greany to Dixon effective that date. *See* plaintiff's exhibit 3. That instrument was accompanied by a five-year non-competition agreement. *See* plaintiff's exhibit 4. Under the terms of the contract, Dixon paid Greany $40,000 on September 30. Over the course of the successive five years, Dixon would be obligated to pay Greany a percentage of "gross profit (total sales minus job costs). . . ." Those payments were due on a monthly basis: the payment based on one month's gross profit was due by the end of the following month. For the months in 2005 and 2006, Dixon was to pay Greany 18.25% of the firm's gross profit. For the months in 2007, 2008 and 2009, those payments would amount to 12.25% of the firm's gross profit. Dixon was required to provide Greany with copies of the monthly financial statements generated by the company (while Greany owned the company, these reports were produced through the Clients and Profits program) and with copies of the company's annual tax returns. The payments based on the two percentage levels were attributed to the value of the non-competition agreement.

As is revealed by the terms of the contract itself and by the evidence in this case, "gross profit" is the difference between the income generated by a particular job and the costs incurred to perform that job. Those "job costs" do not include overhead or other expenses that the firm incurs in any event. Thus, if work on a job is performed by persons outside of the agency, such as free-lancers, then the cost of that outside work is treated as a "job cost" and operates to reduce the "gross profit" associated with that

3

project. On the other hand, if that same work is performed by DWC employees or others who are not paid specifically for that particular work, then any such cost that might be attributed to that work (salary and the cost of benefits, for example) is not treated as a "job cost," thereby resulting in a higher "gross profit" for that project. Costs of production specific to a project are also treated as a "job cost" for this computation.

At the time of the transaction, DWC owed Greany on a loan of $240,000. Greany personally had loaned this money to the company when the company had financial difficulties during the first part of the current decade, coinciding with a general industry recession. As part of the sale agreement between the parties, Greany forgave this loan obligation. Additionally, Greany assumed all but one long-term debt owed by DWC to third-party obligees.[1] These debts amounted to nearly $140,000.

During the negotiations, Greany initially proposed that Dixon would make a single payment of $250,000 to acquire the company from Greany. Dixon did not have access to such a sum and in fact wanted to make as small an initial payment as Greany would accept, in order to preserve working cash to be used in the business. Greany was willing to accommodate this type of arrangement. Ultimately, the parties agreed to the consideration structure noted above, which consisted of a relatively modest initial payment to be followed by future payments based on earnings. In agreeing to the levels of future payments required under the contract, Dixon had examined the financial information that Greany provided to her (and that Dixon, in turn, provided to Hamel) and concluded that she could achieve income levels sufficient to cover the firm's expenses, including the payments due to Greany.

In her counterclaim, Dixon has attacked the enforceability of her contract with Greany, alleging that Greany misrepresented the condition of DWC. In her written summation, she offers a brief argument on this point, contending that Greany misrepresented the condition of the business' financial health. The record fails to support this contention. Dixon's argument is based on several aspects of the company's financial condition. She argues first that Greany misrepresented the status of DWC's relationship with their clients. The record, however, reveals that Greany gave Dixon her assessment of whether the firm's major clients might continue to draw on the firm's business. *See,*

---

[1] DWC remained responsible for a loan on a company car.

*e.g.*, plaintiff's exhibit 2 at Bates 6-7. Even Dixon's request for this assessment was couched in soft terms. *See id.* at Bates 9 ("Which clients do you think will stay. . .and your best guess as to what they might spend after the transaction."). From her extensive experience in the industry and from Hamel's specific advice to her, however, Dixon knew full well the sometimes mercurial nature of agency-client relationships and the susceptibility of those relationships to the individual people who represent the interests of the principals. Even prior to the time the transaction closed in September 2004, Dixon knew that she would need to develop new clients and not rely on existing ones. Immediately surrounding the time of the transfer of ownership, Greany and Dixon traveled together to meet with representatives of DWC clients so that Greany could introduce them to Dixon. Dixon was fully satisfied with these efforts to establish a foundation for the transition. As it turned out, a number of DWC clients did not continue their business with the firm. This, however, is not reflective of any misrepresentations by Greany.

Dixon also argues that the financial information about the firm was distorted because Greany was not taking a salary and because she had loaned money to the business. The record demonstrates, however, that Dixon was fully aware of these circumstances. *See, e.g.*, plaintiff's exhibit 2 at Bates 10, 13. Indeed, she testified at trial that she actually knew that Greany was not taking a salary, and the agreement itself refers to the outstanding loan that Greany had extended to the company. As Hamel testified, he, serving as Dixon's financial consultant, was provided with all of the financial information he requested, and that information was accurate.

Finally, Dixon contends that Greany failed to disclose information about credit problems with DWC and that this failure to disclose is actionable because, in the contract, Greany recites "that the corporation is in good condition at the time of the closing, that all financial information is intact and the company is fully-operational." *See* plaintiff's exhibit 3. None of these representations was false. The business was in fact in "good condition." DWC enjoyed a strong reputation for quality work, supported by clients that were fully satisfied with the services that the firm had provided. Greany did what she could to create a productive relationship between Dixon and those clients. Although the nature of "intact" financial information is not readily apparent, Greany had provided

5

Dixon with all financial data that she and her consultants requested. None of that information was incorrect. Although DWC was not able to secure credit subsequent to the transaction, Dixon acquired a company that was steadily recovering from a financially stretch, and one could not ask for more than what Dixon obtained: a company that was virtually free of debt.

The limited evidence on the firm's credit standing is that Dixon was unable to obtain credit for the firm. *See* defendant's exhibits 104, 105. This problem does not reflect any misrepresentations that Greany made about the company's financial condition.[2] The denials are based largely on the same information to which Dixon had access prior to her acquisition of DWC. The only reason underlying the denial of credit of which Dixon could not have known was a tax lien. *See* defendant's exhibit 105. As Greany testified, she learned subsequent to September 30, 2004, that there was a tax lien against the company or its assets. Even if Greany had been unaware of this matter, any non-disclosure cannot be viewed as material. The tax lien arose from a tax liability of less than $300. Greany learned of the matter during the period of time shortly after the closing while she was working for DWC to help Dixon with the transition of ownership, and she then contacted the IRS about the matter. After Dixon became aware of the issue, she did not press the matter with Greany because Greany had incurred expenses during the post-closing transition. Under these circumstances, the court cannot find that the undisclosed tax lien was a material factor in Dixon's inability to obtain credit for DWC after she acquired the company.

When the quality of Dixon's decision to acquire the company is viewed more broadly, at best for Dixon, as she herself stated during her testimony, she simply made a "mistake" when she decided to acquire ownership of DWC. Dixon's mistake, if she made one, is not attributable to Greany.

---

[2] One of the letters denying credit to DWC is dated September 28, 2004, *see* defendant's exhibit 105, which was two days prior to the date Dixon bought the corporate shares from Greany. This leaves open the possibility that Dixon received the letter prior to the closing and thus that she would have been aware, prior to the closing, of the existence of problems acquiring credit and of the reasons underlying the denial.

6

For these reasons, the court concludes that the evidence does not support Dixon's contention that the transaction fails or is unenforceable due to any misrepresentations or other actionable conduct that she assigns to Greany.

Dixon has plainly failed to perform under the contract, because she did not provide the financial records to Greany as required by their agreement and, more importantly, because she has not made the payments required by that agreement. Dixon argues that any liability arising from Greany's contract claim is limited to Greany's right to recover the shares of corporate stock that Dixon pledged to her (and that are now in the possession of Greany's corporate counsel) in the event of a default. Although this relief is available to Greany, the parties' contract also entitled Greany to receive payments of money as consideration for the transfer of ownership of DWC, and nothing in the contract purports to limit Greany's remedies to the reacquisition of the shares. In fact, during the negotiations, Greany made it express to Dixon that she (Greany) absolutely did not want to recover ownership of the corporation if Dixon failed to perform. *See* plaintiff's exhibit 2 at Bates 22. Dixon was therefore on notice that, upon a breach, Greany intended to retain the right to pursue remedies other than recovery of the corporate shares. The terms of the contract subsequently executed by the parties do not foreclose such a right.

As is noted above, Dixon paid Greany $40,000 on the closing date, as the contract provided. Dixon, however, has not paid Greany any of the money that became due to her beginning in 2005. The payments that were to commence in 2005 and then continue for five years were tied directly to the performance of the business. Dixon did not provide Greany with copies of the monthly financial statements generated by the Clients and Profits software as required by the contract, because of problems with the program. The "corruption" was a phenomenon that also had occurred at separate times while Greany owned DWC. Jill Shannon, the company's bookkeeper until shortly after Dixon bought the company, was able to resolve similar problems when they arose. Despite transitional assistance that Shannon provided during the latter months of 2004 and even into 2005, it

7

appears that Dixon did not hire a successor to Shannon who was capable of operating Clients and Profits competently. This compounded the software problem.[3]

Nonetheless, the record provides adequate information to determine the computational foundation for the payments that were due to Greany in 2005 and 2006. These data consist of the financial figures that DWC itself assembled for 2005, which appear to have been endorsed by Hamel, Dixon's accounting expert. *See* plaintiff's exhibit 110. The figures, presented in the form of a year-end income statement, reveal that DWC's total gross income for 2005 was $394,500; its total 2005 "job costs," which has a meaning equivalent to the term as used in the parties' contract, were $184,600; and the difference between the two, characterized as "gross profit," is $210,000.[4] Under the parties' contract, for 2005 Greany was entitled to payment of 18.25% of the company's gross profit, which is $38,325. The evidence further reveals that the company's financial performance for 2006 was comparable to 2005. The contract obligated Dixon to pay Greany the same percentage of gross profit, which is thus $38,325.

Dixon argues that the level of gross profit became unfairly inflated subsequent to her acquisition of DWC in September 2004, because she decreased the use of independent free-lance personnel and instead relied more on in-house resources. Because the cost for in-house services, including those services provided by the company's employees, is treated as overhead and not characterized as job costs, this reduces the amount of the deduction that is made from total receipts in order to arrive at a "gross profit," and therefore the amount of that "gross profit" is correspondingly increased. The formula used to determine the payments owed to Greany, however, is made clear in the parties' contract, into which the parties entered knowingly and voluntarily. That instrument essentially defines the elements used to calculate the payments that Dixon would be required to make to Greany. Further, these concepts are used routinely in the public relations and advertising industry, in which both parties had been participants for

---

[3] In her testimony, Dixon acknowledged that the software problems are not attributable to Greany. Those problems thus must be seen as an unfortunate post-transaction development.

[4] As is noted above, the difference between gross income and job costs does not represent the company's net profit. Out of that difference come overhead and other internal expenses. The latter expenses are also set out in the 2005 income statement.

8

many years prior to September 2004. It also appears that prior to the transaction date, Dixon favored DWC's allocation between work performed by free-lance contractors and in-house staff. *See* plaintiff's exhibit 2 at Bates 10 ("I [Dixon] like your current model and would like to maintain as many free lance resources as possible. . ."). Dixon's subsequent decision to reallocate that work and place greater emphasis on in-house production does not relieve her of her obligations under the contract, even though it may affect the amount of the payments that Greany was entitled to receive. That decision can only have been made with an awareness of the consequences.

For these reasons, the court concludes that Greany is entitled to damages of $76,650 for money that she was entitled to receive from Dixon in 2005 and 2006.

For the remaining three years in which Greany is to be paid under the contract, namely, 2007-2009, she contends that the gross profit used to determine the amount of those payments should be the same as that used to calculate the payments due from 2005 and 2006. That predicate for compensatory damages that might arise from those years is utterly speculative. That the company's gross profits were similar in 2005 and 2006 is not a sufficient basis to support the conclusion that its gross profits will continue at that level for the next three years (particularly for two years that even now are in the future).

Greany argues that if evidence of damages is too speculative to be quantified reasonably, she is entitled to damages equivalent to the value of the company when she sold it to Greany. The court harbors doubts whether this is a proper measure of damages because the parties specifically agreed to a payment structure that was not tied to the value of the company. Rather, the amount of payments that Dixon agreed to pay Greany was a direct function of the company's performance between 2005 and 2009. Thus, for Greany to recover an amount equal to the value of the firm would not satisfy the expectation interests embodied in the agreement. Further, the authority cited by Greany to support her contention that this is the proper measure of damages, *June Roberts Agency, Inc. v. Venture Properties, Inc.*, 676 A.2d 46, 49 n.1 (Me. 1996), is inapposite in this situation, where the parties had entered into a valid and enforceable contract but an aggrieved party fails to prove her damages.

Setting aside these issues of law, however, even if a claimant such as Greany were entitled to an award of damages based on the value of the asset conveyed to the breaching

9

party, the evidence of the value of DWC in September 2004 is insufficient to allow a reasonable determination of that value. Greany argues that this value was $250,000. (From this, she seeks judgment for $210,000, which would allow Dixon credit for the $40,000 payment made on the closing date.) There are two independent reasons why, in the court's view, the supporting evidence is unpersuasive.

First, the valuation opinion is from Anthony Mikes, who is the managing director of a network of advertising agencies, of which DWC has been a member. Mikes testified that he performed a valuation analysis based on a customary and accepted approach and, as a result of that process, concluded that the firm had a value of $250,000. The record contains virtually no information, however, about the nature of that process or the underlying data. Evidence of Mike's opinion is virtually conclusory, and it does not carry substantial weight.

Second, the court does place weight on the observations and assessment of Hamel, who also testified on the question of value. Hamel considered the valuation question from an investment perspective: how much value did the company have in the eyes of a buyer who would want a sufficient return to justify the purchase price? Hamel explained that a reasonable investor would want to recover that purchase price within a reasonably foreseeable period of time following the acquisition of the firm. Hamel used a five-year time frame. Under this approach, if the company were worth $250,000 as Mike contends, it would need to generate a net profit of $50,000 annually for that five-year period. However, because DWC is a subchapter S corporation, its net profit is treated—and taxed -- as income for the shareholder. Therefore, to realize $50,000 in post-tax income, the company's net profit would need to be even greater to account for the resulting tax liability imposed on the shareholder. The company's financial performance, as reflected in such exhibits as plaintiff's exhibit 69 and 71, and defendant's exhibits 109 and 110, simply do not support Mikes' opinion of value.

With or without this failure of proof, however, the more appropriate form of relief remains available to Greany. When the parties agreed to the formula for payments that Dixon would owe to Greany, they chose to characterize the percentage-based payments (that is, all payments subsequent to the $40,000 that Dixon paid Greany on the transaction date of September 30, 2004) as consideration for Greany's agreement not to

10

compete with DWC. Although tax considerations motivated one or both parties to treat those payments in this way, the fact remains that as the parties framed their agreement, the payments that remain outstanding support the non-compete provision of the contract. There is no evidence that Greany has not remained faithful to that obligation, and Greany now seeks to be excused from it. If she is excused from the prohibition against activities that would be proscribed under the agreement, then Dixon should also be excused from paying Greany to comply with that requirement. Dixon will remain obligated to pay Greany for the two years over which Greany has satisfied the non-compete covenant. However, when framed in terms of applicable contract principles, Dixon's breach of the contract is a material breach, and Greany is entitled to an adjudication that the contractual relationship is at an end. *See, e.g., Down East Energy Corp. v. RMR, Inc.*, 1997 ME 148, ¶ 10, 697 A.2d 417, 421. Greany is therefore relieved from her obligation under the non-compete agreement. *Id.* Correspondingly, Dixon is relieved of her obligation to pay Greany for the duration of that non-compete covenant, because Greany is no longer required to satisfy it.

The entry shall be:

On the complaint, judgment is entered for the plaintiff in the amount of $76,650, pre-judgment interest at the annual rate of 7.36%, post-judgment interest at the annual rate of 10.99%, and her costs of court. The covenant not to compete shall be void and unenforceable, effective immediately.

On the counterclaim, judgment is entered for the counterclaim defendant (the plaintiff).

This order and judgment shall be deemed to adjudicate all claims in this action.

Dated: August 29, 2007

_____
Justice, Maine Superior Court

FILED &
ENTERED

AUG 3 0 2007

SUPERIOR COURT
HANCOCK COUNTY

11